UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                        :
CYNTHIA Y. CALLISTRO,                   :
                                        :
                    Plaintiff,          :        11 Civ. 2897 (DLC)
                                        :
        -v-                             :        OPINION & ORDER
                                        :
RICHARD CABO and NEW YORK CITY PARKS    :
DEPARTMENT,                             :
                                        :
                    Defendants.         :
                                        :
----------------------------------------X

Appearances:

For Plaintiff:

Cynthia Y. Callistro, pro se
1353 Sheridan Avenue, Apt. #3A
Bronx, NY 10456

For Defendant:

Michael A. Cardozo
Eric Eichenholtz
Asad Rizvi
New York City Law Department
100 Church Street
New York, NY 10007


DENISE COTE, District Judge:

        Plaintiff pro se Cynthia Callistro ("Callistro") brings

this lawsuit against defendants Richard Cabo ("Cabo") and the

New York City Parks Department ("Parks Department") alleging

that the defendants discriminated against her because she is a

Christian woman and subjected her to a hostile work environment

in violation of Title VII of the Civil Rights Act of 1964, 42
U.S.C. § 2000-e et seq. ("Title VII").  Callistro also claims
age discrimination under the Age Discrimination in Employment
Act, 29 U.S.C. § 621 et seq. ("ADEA"), and disability
discrimination for the defendants' failure to accommodate her
diabetes and osteoarthritis under the Americans with
Disabilities Act, 42 U.S.C. § 12112(a) et seq. ("ADA").
Following the completion of discovery, the Parks Department
moved for summary judgment on all claims.  For the following
reasons, the defendants' motion for summary judgment is granted
in part.  Each of the plaintiff's claims is dismissed except her
claims asserting the existence of a hostile work environment.


I.  BACKGROUND

     Unless otherwise noted, the following facts are undisputed,
taken from the plaintiff's deposition, or taken in the light
most favorable to the plaintiff.  Callistro began work for the
Parks Department as a seasonal Job Training Participant ("JTP")
in November 2008.  JTPs are hired through the Parks Opportunity
Program ("POP"), which is designed to help individuals on public
assistance find meaningful employment.  The POP provides
individuals with short-term jobs and holds sessions on job-
finding skills such as resume writing and interviewing.  The
Parks Department hired Callistro for six months.  She was

assigned to work five days per week from 7:00 a.m. to 3:00 p.m. at the Citywide Nursery in Van Cortlandt Park (the "Nursery"), where her duties included planting trees, potting and transporting plants, and maintaining the grounds.  Cabo was the Director of the Nursery at the time of Callistro's employment. Cabo and Deborah Mercado ("Mercado") served as Callistro's direct supervisors.

A.  Orientation Program

Prior to beginning work as a JTP, Callistro attended a one-day orientation program regarding employment at the Parks Department.  At the orientation, Callistro was informed in relevant part that (1) there was a number to call to report any difficulties experienced during the course of her employment, and (2) she was required to notify her supervisors in advance or present a medical note if she was ever unable to report to work. Callistro also signed a form confirming that she received a copy of the Parks Department's Standards of Conduct and Equal Employment Opportunity Procedures and that she was required to read these manuals carefully.

B.  Callistro's Medical Condition

Callistro suffers from diabetes and from osteoarthrits. Callistro was required to and did submit a doctor's note to the Parks Department regarding her medical condition before starting her JTP position.  Callistro saw Dr. Alda Osinaga and informed

3

Dr. Osinaga that she would be working 40 hours per week in a "physical position" which included "watering plants and potting up."  After their meeting, Dr. Osinaga wrote a doctor's note dated October 30, 2008 stating that Callistro's diabetes and osteoarthritis "are controlled and do not prohibit her from working in the parks system.  She may start working in the [N]ursery."[1]  Callistro discussed her diabetes and osteoarthritis with Mercado and also claims that Cabo was aware that she had diabetes.

On several occasions, Callistro took taxis and Access-A-Ride transportation to work on account of her osteoarthritis. Callistro also testified that Cabo forbade those vehicles from entering the grounds near the Nursery for a period of time during her employment, and that she reported Cabo's decision to prohibit her use of Access-A-Ride to Mercado.  According to Callistro, Mercado responded, "Well, you have to listen to Richie [Cabo]."

C.  Cabo's Comments

Callistro had a "cordial" relationship with Mercado but describes her interactions with Cabo as "hostile."  Callistro did not work with Cabo on a day-to-day basis.  Callistro

---

[1] Callistro stated that at the time of her meeting with Dr. Osinaga, she "did not know about the walk to get onto the [Nursery] grounds and the freezing weather" that she would experience during her employment.

testified, however, that in her first encounter with Cabo in November 2008, Cabo asked her, "Are you a fucking Christian? Why are you always wearing a fucking skirt?"  According to Callistro, Cabo would "constantly" refer to her as a "fucking Christian" and a "fucking dog."  Other Parks Department employees were present when Cabo made these comments, and at times they would tell Cabo to "lighten up."  After Callistro had been late to work for several days in late 2008, Cabo once told Callistro that he was going to "fucking terminate" her.  Cabo also once called Callistro a "fucking duck" and said he would "shoot [her] down."

One day, Cabo read a memorandum aloud to Callistro and several other JTPs.  When the memorandum made reference to JTPs under the age of 25, Cabo turned to Callistro and said, "Yes, Cynthia, you're too fucking old for this."  The other JTPs laughed in response.

With respect to Callistro's diabetes and osteoarthritis, on one occasion, Cabo asked Callistro why she was "fucking eating." Callistro also claims that Cabo told her that she was not disabled and accused her of "getting over on the system" by fraudulently using Access-A-Ride transportation vehicles to arrive at work in the morning before he restricted their access to the Nursery.  According to Callistro, Cabo also once accused her of submitting fake doctors' notes with respect to her

disabilities and absences and once banged on the ladies bathroom door while Callistro was inside and asked her to "hurry up."

Callistro stated that she spoke to Mercado about "Cabo's foul language." She also attempted to speak to other supervisors at a Bronx Park East location about Cabo but was "waiting for 3 hours."

D.  Callistro's Attendance and Disciplinary History

Callistro arrived late to work on December 30 and 31, 2008 and on January 1, 2009. She also was absent from work without leave and failed to provide documentation, such as a doctor's note, excusing her absence on January 2. On January 7, 2009, Cabo met with Callistro to discuss her recent absences and issued an unofficial warning letter regarding her "[a]ttendance and [t]ardiness," which was signed by Cabo, Callistro, and Mercado.[2]  The letter noted Callistro's late arrivals and absence from December 30 through January 2 and informed Callistro that "attendance is a very important part of your job performance." The warning letter also stated that:

> This type of pattern is a blatant cause for termination in itself as you have four occurrences in one week.
>
> Any future occurrences of attendance relate [sic] problems will lead to an official Supervisory Conference and possible termination or disciplinary actions.  This letter

---

[2] Callistro testified that at the January 7 meeting, Cabo held a "big gavel" throughout the meeting and that she "d[oes]n't know if [she] signed [the warning letter] because he had the gavel."

will be attached to any subsequent Supervisory Conference
write ups.

Callistro also did not report to work on March 19 or 20.
On her timecard for those days, Callistro noted that she was
sick and indicated "Dr. notes to follow."

On March 25, Cabo assigned Callistro the task of cleaning
and transporting pots from one area to another in a wheelbarrow.[3]
Callistro did not complete the assignment and yelled at Cabo
when he approached her to check on her progress.

That same day, Cabo called Callistro into a Supervisory
Conference, which Mercado also attended.  The post-conference
report states that Cabo cautioned Callistro "concerning [her]
failure to comply with departmental rules and regulations,
and/or your failure to follow the orders of your supervisor."
More specifically, Cabo indicated on the report that Callistro
"did not follow my directions" in cleaning and transporting the
pots, and "[w]hen I tried to explain to you again the simple way
to do it, you began to yell at me."  Cabo also noted that
Callistro had continued to take sick days and that "[t]he agency
frowns upon this pattern of absence.  I previously warned you
about your absence.  Yelling at your supervisor is not
acceptable."

---

[3]  Callistro estimated the total number of pots as "about 500."

Callistro refused to sign the post-conference report. Instead, Mercado signed the report as a witness.

E.   Termination

On March 25, the same day as the Supervisory Conference, Cabo completed a Seasonal Termination Form, which recommended that Callistro be fired for "unsatisfactory work performance" and for "insubordination; failure to carry out orders," including the fact that "during supervisory [Callistro] was screaming at me again." Callistro's termination from employment was approved on March 29, 2009.

Callistro appealed the termination in a hearing with DC37, at which her mother, union representative, and a hearing officer were present. The appeal was denied. Callistro filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on July 27, 2009. She claimed discrimination on the basis of her age, religion, and disability. Although the form also included a box to indicate discrimination based on "sex," Callistro did not assert a gender discrimination claim in her EEOC charge.


II.   DISCUSSION

The defendants have moved for summary judgment on each of the plaintiff's claims. Summary judgment may not be granted unless all of the submissions taken together "show that there is

8

no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of demonstrating the absence of a material factual question, and in making this determination, the court must view all facts "in the light most favorable" to the non-moving party. Holcomb v. Iona Coll., 521 F.3d 130, 132 (2d Cir. 2008); see also Eastman Kodak Co. v. Image Technical Services, Inc., 504 U.S. 451, 456 (1992).

Once the moving party has asserted facts showing that the non-movant's claims cannot be sustained, the opposing party must "set out specific facts showing a genuine issue for trial," and cannot "rely merely on allegations or denials" contained in the pleadings. Fed. R. Civ. P. 56(e); see also Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009). "A party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," as "[m]ere conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist." Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted). Only disputes over material facts -- "facts that might affect the outcome of the suit under the governing law" -- will properly preclude the entry of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In cases involving allegations of employment discrimination, a court must exercise "an extra measure of caution" in determining whether to grant summary judgment "because direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence." Schiano v. Quality Payroll Sys., Inc., 445 F.3d 597, 603 (2d Cir. 2006) (citation omitted); see also Holcomb, 521 F.3d at 137.  Even in an employment discrimination case, however, "a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment." Id.  The ultimate test for summary judgment in discrimination cases, as in other cases, "is whether the evidence can reasonably support a verdict in plaintiff's favor." James v. N.Y. Racing Ass'n, 233 F.3d 149, 157 (2d Cir. 2000).

Finally, in considering the defendants' summary judgment motion, the Court liberally construes all submissions by the pro se plaintiff and "interpret[s] [them] to raise the strongest arguments that they suggest." Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 474 (2d Cir. 2006) (per curiam) (citation and emphasis omitted).  The application of this forgiving standard for pro se litigants, however, "does not relieve plaintiff of [her] duty to meet the requirements necessary to defeat a motion for summary judgment." Jorgensen v. Epic/Sony Records, 351 F.3d 46, 50 (2d Cir. 2003) (citation omitted).

A.  Exhaustion of Administrative Remedies

As a preliminary matter, the defendants argue that Callistro's gender discrimination claim must be dismissed because she failed to raise it in her EEOC charge.  Prior to bringing discrimination claims under Title VII, a plaintiff must exhaust available administrative remedies by filing a charge of discrimination with the EEOC.  See McPherson v. New York City Dept. of Educ., 457 F.3d 211, 213 (2d Cir. 2006).  Claims omitted from an EEOC complaint, however, may still be pursued in a subsequent federal court action if they are "reasonably related" to those asserted in the EEOC filing.  Mathirampuzha v. Potter, 548 F.3d 70, 75 (2d Cir. 2008).  A claim is "reasonably related" to the charge in an EEOC complaint if "the conduct complained of would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination."  Id. at 76 (citation omitted).

Callistro did not include a gender claim in her EEOC complaint, even though the form listed gender as a category.  There is, however, one passage in the EEOC complaint that hints at a gender discrimination claim.  Callistro's EEOC complaint states inter alia that Cabo "questioned [her] choice of clothing in regards to [her] religion."  Thus, Callistro's religious discrimination claim is based in part on Cabo's comments related to her wearing a skirt.  It will be assumed for the purposes of

11

this Opinion that Callistro's EEOC charge contained the "factual underpinnings" of a gender discrimination claim.  See id. at 77. This prong of the defendants' summary judgment motion is therefore denied.

B.  Gender, Religious, and Age Discrimination

Callistro brings claims of employment discrimination as to her gender, religion, and age under Title VII and the ADEA. Title VII provides that "[a]ll personnel actions affecting employees or applicants for employment . . . shall be made free from any discrimination based on race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-16(a).  The ADEA provides that "[a]ll personnel actions affecting employees or applicants for employment who are at least 40 years of age . . . shall be made free from any discrimination based on age."  29 U.S.C. § 633a(a).  Under the ADEA, the plaintiff must demonstrate that age discrimination was the "but-for cause" of the adverse employment action, while under Title VII, the plaintiff may prevail even where discrimination was only a "motivating factor" behind the adverse action.  Gross v. FBL Financial Services, Inc., 557 U.S. 167, 174, 177 (2009); accord Gorzynski v. JetBlue Airways Corp., 596 F.3d 93, 106 (2d Cir. 2010).

Claims of employment discrimination brought under Title VII or the ADEA are analyzed using the burden-shifting framework set

forth in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802-203
(1973).

> To establish a prima facie case of age discrimination under
> the ADEA or [any form of] discrimination under Title VII, a
> plaintiff must demonstrate the following: (1) she was
> within the protected class; (2) she was qualified for the
> position; (3) she was subject to an adverse employment
> action; and (4) the adverse action occurred under
> circumstances giving rise to an inference of
> discrimination.

<u>Leibowitz v. Cornell Univ.</u>, 584 F.3d 487, 498 (2d Cir. 2009).  A
plaintiff's burden in presenting evidence to support a <u>prima
facie</u> case is "de minimis."  <u>Sassaman v. Gamache</u>, 566 F.3d 307,
312 (2d Cir. 2009) (citation omitted).

If the plaintiff satisfies this initial burden, a
presumption of discrimination arises, and "the burden shifts to
the defendant to articulate some legitimate, nondiscriminatory
reason for its action."  <u>Leibowitz</u>, 584 F.3d at 498-99 (citation
omitted).  If the defendants can offer such a reason, the
presumption of discrimination dissolves, and "the burden shifts
back to the plaintiff to demonstrate by competent evidence that
the legitimate reasons offered by the defendants were not their
true reasons, but were a pretext for discrimination."  <u>Id</u>. at
499 (citation omitted).  The plaintiff may do so by showing that
the defendants' reasons were pretextual or that the defendants'
reasons "were not the only reasons and that the prohibited
factor was at least one of the motivating factors."  <u>Holcomb</u>,

13

521 F.3d at 138 (citation omitted).  Although the burden of
producing evidence may shift between the parties under this
framework, the "ultimate burden of persuading the trier of fact
that the defendants intentionally discriminated against the
plaintiff remains at all times with the plaintiff."  Leibowitz,
584 F.3d at 499 (citation omitted).

The plaintiff "bears the initial burden of establishing a
prima facie case of discrimination."  Gorzynski, 596 F.3d at
106.  The defendants here focus their arguments on Callistro's
purported failure to satisfy the fourth element of the prima
facie discrimination case, namely, that the circumstances give
rise to an inference of discrimination.

A plaintiff may satisfy the fourth prong through any of at
least three different kinds of evidence.  First, the plaintiff
may carry her burden "by showing that the employer subjected
[her] to disparate treatment, that is, treated [her] less
favorably than a similarly situated employee outside [her]
protected group."  Graham v. Long Island R.R., 230 F.3d 34, 39
(2d Cir. 2000).  A plaintiff relying on this type of evidence
"must show she was similarly situated in all material respects
to the individuals with whom she seeks to compare herself."  Id.
(citation omitted).  Second, a plaintiff may carry her burden by
demonstrating that the defendants have engaged in a "pattern-or-
practice" of intentional discrimination.  Robinson v. Metro-

14

North Commuter R.R. Co., 267 F.3d 147, 158 (2d Cir. 2001).  To
succeed on this theory, a plaintiff "must establish that
intentional discrimination was the defendants' 'standard
operating procedure.'"  Id. (citation omitted).

Finally, the plaintiff may satisfy her burden of proving
the fourth prong by adducing facts which "evinc[e] a
discriminatory state of mind" on the part of the employer.
Tomassi v. Insignia Fin. Group, Inc., 478 F.3d 111, 115 (2d Cir.
2007).  "[A]n inference of discriminatory intent may be derived
from a variety of circumstances, including, but not limited to .
. . the employer's criticism of the plaintiff's performance in
ethnically degrading terms; or its invidious comments about
others in the employee's protected group; . . . or the sequence
of events leading to the [adverse action]."  Leibowitz, 584 F.3d
at 502 (citation omitted).  "[B]ecause 'smoking gun' evidence of
discriminatory intent is rare," a court must carefully review
the record to search for any kind of evidence that would support
an inference of intentional discrimination.  Forsyth v. Fed'n
Emp't & Guidance Serv., 409 F.3d 565, 569 (2d Cir. 2005); see
also Holcomb, 521 F.3d at 141 ("[E]mployers are rarely so
cooperative as to include a notation in the personnel file that
the [adverse action was taken] for a reason expressly forbidden
by law." (citation omitted)).

The defendants are entitled to summary judgment on Callistro's gender, religious, and age discrimination claims. Callistro makes two principal arguments in support of her discrimination claims, both of which fail to sustain an inference that the decision to fire her was in any way due to her Christianity, gender, or age.

First, Callistro raises a disparate treatment claim by asserting that "other JTPs" were generally treated more favorably than she and that she was given "extra assignments" such as counting and cleaning pots.  In order to raise an inference of discrimination by showing disparate treatment, however, the plaintiff must show she was "similarly situated in all material respects" to the individuals with whom she seeks to compare herself.  McGuinness v. Lincoln Hall, 263 F.3d 49, 53 (2d Cir. 2001) (citation omitted).  In this analysis, there must be an "objectively identifiable basis for comparability" between the plaintiff and the comparator.  Graham, 230 F.3d 34, 40 (2d Cir. 2000) (citation omitted).

Callistro has not established either that there was any discrepancy in the difficulty of the assignments she was asked to perform as compared other JTPs or that her comparator "other JTPs" were outside her protected group.  But for Callistro's testimony regarding a woman named Rosanna who was similarly tasked to count pots, Callistro has not provided any evidence

16

that JTPs who were not given such "extra assignments" were not Christian, not female, or younger than 46 years old.  As a result, Callistro has not provided evidence that she was treated "less favorably than a similarly situated employee outside [her] protected group" to support an inference that she was subjected to disparate treatment attributable to discrimination.  Id. at 39.

Callistro's second and principal theory of discrimination arises from her assertion that several comments Cabo made with respect to her gender, religion, and age suggest that she was fired because of one or all of these factors.  Callistro contends in relevant part that Cabo repeatedly referred to her as a "fucking Christian," and called her a "fucking dog."  She argues that Cabo's use of the term "dog" should be understood as a religiously-charged term used to characterize individuals as "unclean" or as a "nonbeliever" and accordingly reflects Cabo's discriminatory attitude.  Callistro also asserts that Cabo asked her why she was "always wearing a fucking skirt" when she arrived on the job, and once said that she was "too fucking old" when reading a memorandum referring to JTPs under the age of twenty-five.

Cabo's comments, however disturbing, are insufficient to demonstrate that the defendants acted with discriminatory intent when Callistro was fired.  "The relevance of discrimination-

17

related remarks does not depend on their offensiveness, but
rather on their tendency to show that the decision-maker was
motivated by assumptions or attitudes relating to the protected
class." Tomassi, 478 F.3d at 116.

> In determining whether a remark is probative [of
> discrimination, courts] conside[r] four factors: (1) who
> made the remark (i.e., a decision-maker, a supervisor, or a
> low-level co-worker); (2) when the remark was made in
> relation to the employment decision at issue; (3) the
> content of the remark (i.e., whether a reasonable juror
> could view the remark as discriminatory); and (4) the
> context in which the remark was made (i.e., whether it was
> related to the decision-making process).

Henry v. Wyeth Pharmaceuticals, Inc., 616 F.3d 134, 149 (2d Cir.
2010).

Under this test, the second and fourth factors weigh
against finding that Cabo's remarks are indicative of
discriminatory intent.  Although it is true that Cabo was a
decision-maker in connection with Callistro's employment,
Callistro has not presented any evidence that tends to show that
Cabo referred to her religion, gender, or age in relation to the
decision to fire her or in connection with the events
surrounding the termination of her employment.  By Callistro's
own account, Cabo's tendency to curse when referencing her
Christian religion began in their very first interaction in
November 2008, at least one month before any discussion of
terminating her employment occurred.  Callistro has only
identified one instance in which Cabo obliquely referred to her

18

gender, in a comment that was also made at the very beginning of
her employment.  Similarly, Cabo only mentioned Callistro's age
on one occasion, and that comment was made in the context of
reading aloud from a memorandum that referred to JTPs younger
than twenty-five.  The events of March 25, 2009 which
immediately preceded Callistro's firing -- including Cabo's
interactions with Callistro regarding her assignment to clean
and transport pots, the Supervisory Conference, and Cabo's
Seasonal Termination Form -- are devoid of any repetition by
Cabo of the terms that Callistro claims evince discrimination.
Callistro also failed to produce the index cards on which she
claims to have detailed Cabo's other discriminatory behavior or
remarks.  Accordingly, Cabo's repetitions of profanity before
referring to Callistro's religion, age, or gender do not raise
questions of fact regarding Cabo's discriminatory intent.

       Moreover, Callistro has not adduced any evidence
demonstrating a pattern or practice of discrimination by the
defendants against Christians, women, or JTPs of a similar age.
In the absence of any such evidence, an inference of age,
gender, or religious discrimination cannot be drawn.

       Callistro has thus failed to carry her limited burden of
establishing a prima facie case of discrimination.  But, even if
Callistro were able to establish a prima facie case of
discrimination, the Parks Department has identified a

legitimate, nondiscriminatory reason for firing her.  It is
undisputed that Callistro was late to or absent from work on at
least six days, did not present notes from a medical
professional excusing those absences either at the time or in
discovery practice related to this motion,[4] failed to complete at
least one task to which she was assigned, and yelled at her
supervisor.  After Callistro received both an unofficial warning
and a Supervisory Conference regarding her record of attendance
and "insubordination," the Parks Department determined that it
should fire her.

    At this point, the burden shifted to Callistro to present
evidence from which a jury could infer that that decision was
motivated by discrimination.  For the reasons just described,
Callistro has failed to show that the reason given by the Parks
Department for firing her was pretextual or that there is any
other basis to find that Callistro was fired due to
discrimination based on religion or gender, or that age was the
but-for cause of the termination of her employment.

---

[4] The only doctors' notes in the record in this action are (1)
the October 30 note from Dr. Osinaga which predate any of her
absences; and (2) an April 2, 2009 "verification letter" from
Latonya S. Whitley, Senior Clerk, Adult Medicine Division,
Montefiore Medical Group, which purports to "stat[e] the dates,
and times Ms. Callistro was seen at our clinic" and to "attac[h]
multiple copies of the encounter visits/dates, and diagnoses."
Callistro, however, does not provide either the list of clinic
visits or the list of diagnoses as evidence.

C.  Hostile Work Environment

The defendants construe a general hostile work environment claim from Callistro's submissions.  The only objectionable acts that Callistro claims were "constant" throughout her work at the Nursery, however, are Cabo's comments as to her Christian religion.  Callistro, by contrast, identifies only sporadic instances in which Cabo made offensive remarks with reference to her age, gender, or disabilities.  Thus, it will be assumed for the purposes of this Opinion that Callistro claims that she suffered from a hostile work environment based on her Christian religion.

Title VII prohibits "a discriminatorily hostile or abusive [work] environment."  Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993).  To prevail on a claim that harassment caused a hostile work environment in violation of Title VII, a plaintiff must establish "(1) that the workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of his or her work environment, and (2) that a specific basis exists for imputing the conduct that created the hostile environment to the employer."  Petrosino, 385 F.3d 210, 221 (2d Cir. 2004) (citation omitted).

Unlike claims of discrimination based on inter alia disparate treatment, a hostile work environment claim is "based

21

on the cumulative effect of individual acts." National R.R.
Passenger Corp. v. Morgan, 536 U.S. 101, 115 (2002).  A hostile
work environment claim must, moreover, meet both an objective
and subjective standard.  Not only must the victim herself
"subjectively perceive [the] environment to be abusive," but the
misconduct of which a plaintiff complains also must be "severe
or pervasive enough to create an objectively hostile or abusive
work environment." Petrosino, 385 F.3d at 221 (citation
omitted).  "Isolated incidents of offensive conduct, unless
extremely serious, will not support a claim of discriminatory
harassment."  Id. at 223 (citation omitted).  Rather, a
plaintiff must demonstrate that her workplace was "permeated
with discriminatory intimidation, ridicule, and insult, that
[wa]s sufficiently severe or pervasive to alter the conditions
of [her] employment." Gorzynski, 596 F.3d at 102 (citation
omitted).  Because Title VII prohibits only discriminatory
workplace behavior, a hostile work environment arises only where
the relevant conduct occurred "because of" the plaintiff's
membership in a protected class. Petrosino, 385 F.3d at 221
(citation omitted).

     The defendants contend that Cabo's objectionable conduct
with respect to Callistro's religion was neither sufficiently
severe nor pervasive to constitute a hostile work environment.
It does not argue that it was not on notice of the behavior.

Callistro has presented sufficient evidence from which a jury could conclude that she was subjected to a hostile work environment on account of her Christian religion.  While no single incident is severe enough to constitute actionable conduct, taken as a whole, the conversations and behavior she describes raise a question of fact requiring a determination by a jury.

     D.  Disability Discrimination

     Callistro contends that the defendant failed to accommodate her osteoarthritis by allowing her to take taxis or Access-A-Ride transportation to work at the Nursery and to be seated while working, and failed to accommodate her diabetes by allowing her to take restroom breaks as needed.  Title II of the ADA "proscribes discrimination against the disabled in access to public services."  Harris v. Mills, 572 F.3d 66, 73 (2d Cir. 2009) (citation omitted).  It provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  Id. (citing 42 U.S.C. § 12132).  "To assure those requirements are met, reasonable accommodation may have to be provided to the qualified individual."  Id. (citation omitted).  Where, as in

this case, a disabled plaintiff claims that she can perform a

particular job with a reasonable accommodation,

> the plaintiff's burden requires a showing that (1)
> plaintiff is a person with a disability under the meaning
> of the ADA; (2) an employer covered by the statute had
> notice of his disability; (3) with reasonable
> accommodation, plaintiff could perform the essential
> functions of the job at issue; and (4) the employer has
> refused to make such accommodations.

Graves v. Finch Pruyn & Co., Inc., 457 F.3d 181, 184 (2d Cir.

2006) (citation omitted).

The defendants do not contest that Callistro has a

disability within the meaning of the ADA or that Cabo and

Mercado were aware that she was diabetic and had osteoarthritis.

Instead, the defendants principally argue that summary judgment

should be granted because Callistro failed to provide any

medical evidence that her requested accommodations were

medically necessary in order for her to perform her job.

The defendants are entitled to summary judgment on this

claim. It is well established that a plaintiff "bears the

burdens of both production and persuasion as to the existence of

some accommodation that would allow her to perform the essential

functions of her employment." McBride v. BIC Consumer Mfg. Co.,

Inc., 583 F.3d 92, 97 (2d Cir. 2009). A reasonable

accommodation claim "fails unless the plaintiff establishes that

an effective accommodation existed that would render her

otherwise qualified." <u>Jackan v. N.Y. State Dept. of Labor</u>, 205
F.3d 562, 566 (2d Cir. 2000) (citation omitted).

> The burden of persuasion on the existence of an effective
> accommodation is not satisfied by mere speculation.  For
> example, an employee with a severe motor disorder could not
> successfully carry her burden of persuasion by asserting
> that she would have been qualified to perform the duties of
> her position with the assistance of a mechanical device
> that compensates for her disorder.  She would need to
> demonstrate that such a device existed and was available to
> her employer.

<u>Id</u>. at 566-67 (citation omitted).

Similarly, to support her failure-to-accommodate claim,
Callistro must do more than simply declare that her
osteoarthritis interferes with her mobility or accessibility to
the Nursery or that her diabetes requires frequent trips to the
restroom.  Callistro must provide expert medical evidence to
that effect and she has provided no such evidence.  Instead, the
only medical evidence or records presented state that
Callistro's diabetes and osteoarthritis "are controlled and do
not prohibit her from working in the parks system" and that she
"may start working at the [N]ursery."  The fact that Callistro
testified at her deposition that her osteoarthritis prohibits
her from walking long distances and from sitting or standing in
a stationary position for long periods of time is not sufficient
to support her reasonable accommodation claim.

With respect to her diabetes, Callistro admits in her
deposition that "there are no limits" to the work she can

perform with her diabetes, and that she simply must be able "to eat and walk and move and take my medications" in order to perform her work functions effectively.[5]  Callistro also fails to provide medical evidence that she was required to use bathroom facilities frequently on account of her diabetes and fails to demonstrate that defendants refused to allow her to use the restroom as necessary.  Even assuming, however, that Callistro suffered from this condition and that on one occasion Cabo banged on the restroom door while Callistro was inside and told her to "hurry up," that one incident is insufficient to show that the defendants restricted her access to facilities.  Given this record, Callistro has not presented prima facie evidence that she was improperly denied a reasonable accommodation for her osteoarthritis or diabetes.

The defendants also construe a more general disability discrimination claim from Callistro's submissions.  The ADA prohibits discrimination against a "qualified individual with a disability because of the disability" in the "terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).  In order to sustain a discrimination claim under the ADA, Callistro must prove that: (1) the defendant is covered by the ADA; (2) she suffers from or is regarded as suffering from a disability

---

[5] It is undisputed that Callistro was able to and did keep healthy snacks in the refrigerator at the Nursery.

within the meaning of the ADA; (3) she was qualified to perform the essential functions of the job, with or without reasonable accommodation; and (4) she suffered an adverse employment action because of his disability or perceived disability.  <u>Capobianco v. City of New York</u>, 422 F.3d 47, 56 (2d Cir. 2005).

Insofar as Callistro alleges a broader claim of disability discrimination based on Cabo's comments denying her disabilities, cursing in relation to her disabilities, or claiming her fraudulent use of Access-A-Ride, Callistro has failed to satisfy the fourth prong, namely that she was fired because of her disability.  Notably, Callistro does not claim that her absences or tardiness were in any way connected to her inability to use Access-A-Ride vehicles or taxis to arrive at work or that her failure to complete her assignment cleaning and transporting pots was due to any mobility restrictions associated with her osteoarthritis.  In light of the standards articulated above, the evidence does not tend to show that Cabo's use of profanity in connection with her disabilities evinces any discriminatory intent even when viewed in the light most favorable to the plaintiff.  Callistro has also failed to present any evidence linking Cabo's comments or his alleged exclusion of Access-A-Ride from the Nursery grounds to the circumstances surrounding the decision to fire her.

E.   Claims against Cabo

The defendants have moved to dismiss all claims against Cabo individually.  The only claim to survive summary judgment is Callistro's Title VII hostile work environment claim.  There is no individual liability under Title VII.  Sassaman v. Gamache, 566 F.3d 307, 315 (2d Cir. 2009).  Accordingly, Callistro's hostile work environment claim against Cabo is dismissed.  In light of the grant of summary judgment in the defendants' favor on all ADEA and ADA claims, defendants' arguments concerning the viability of the plaintiffs' claims against Cabo under the ADA and ADEA need not be reached.


                              CONCLUSION

The defendants' September 7, 2012 motion for summary judgment is granted as to each of Callistro's discrimination claims and as to the hostile work environment claim with respect to Cabo.  Summary judgment is denied with respect to Callistro's hostile work environment claim against the Parks Department.


    SO ORDERED:

Dated:    New York, New York
          January 25, 2013

                         _____
                         DENISE COTE
                         United States District Judge


                              28

COPIES MAILED TO:


Cynthia Y. Callistro
1353 Sheridan Avenue
Apt. #3A
Bronx, NY 10456